**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CAPP, INC., YOUNG PEOPLES DAY CAMPS INC., KMJA DAY CAMPS, INC., AND PRAYUS GROUP LLC, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>DISCOVER FINANCIAL SERVICES, DFS SERVICES, LLC, AND DISCOVER BANK,<br><br>        Defendants. | Case No. 1:23-cv-04676 |
| LEMMO'S PIZZERIA, LLC, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>DISCOVER FINANCIAL SERVICES, DFS SERVICES, LLC, DISCOVER BANK, AND DOES 1–100,<br><br>        Defendants. | Case No. 1:23-cv-14250 |
| SUPPORT ANIMAL HOLDINGS, LLC, and LENNYS CASITA, LLC, individually, and on behalf of all other similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>DISCOVER FINANCIAL SERVICES, DFS SERVICES, LLC, DISCOVER BANK, AND DOES 1–100,<br><br>        Defendants. | Case No. 1:23-cv-15297 |

**PLAINTIFFS' UNOPPOSED MOTION AND MEMORANDUM FOR PRELIMINARY
APPROVAL OF CLASS ACTION SETTLEMENT**

## TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................... 1

BACKGROUND ..................................................................................................................... 2

I. Interchange Fees ..................................................................................................... 2

II. The Entities Involved in Credit Card Processing and Who Incurred the Alleged Interchange Fee Overcharges ................................................................................... 2

III. Procedural History and Counsel's Investigation .................................................... 6

IV. Settlement Negotiations and Confirmatory Discovery ........................................... 7

V. Summary of the Settlement Agreement .................................................................. 8

    A. The Settlement Class .................................................................................. 8

    B. Overview of Steps for Determining Settlement Payment Amounts and Payees ......................................................................................................... 8

    C. Calculating the MID Amounts for Each MID ............................................. 9

    D. Notice Program and Claim Process .......................................................... 11

        1. Notice Program ............................................................................. 11

        2. Claims Process .............................................................................. 14

    E. Allocation of MID Amounts ..................................................................... 16

    F. Calculation of Settlement Payments ......................................................... 17

    G. Notice of Total Allocated MID Amounts .................................................. 19

    H. Funding of the Settlement Escrow Account and Distribution of Settlement Payments .................................................................................. 19

    I. Residual Settlement Payment Funds .......................................................... 20

    J. Release ....................................................................................................... 20

    K. Opt-Out and Objection Procedures ........................................................... 21

    L. Attorneys' Fees and Expenses; Service Awards ........................................ 21

    M. Settlement Administrator; Notice and Administration Costs. ................... 22

ARGUMENT ......................................................................................................................... 22

I. Overview of the Class Settlement Approval Process .............................................. 22

II. The Proposed Settlement Meets the Standards for Preliminary Approval. ............. 23

    A. Plaintiffs and Settlement Class Counsel Have and Continue to Zealously Represent the Settlement Class (Rule 23(e)(2)(A)). ............................... 24

    B. The Settlement Is the Product of Arm's-Length Negotiations (Rule 23(e)(2)(B)). ............................................................................................. 24

## <u>TABLE OF CONTENTS</u>
(continued)

<u>Page</u>

C. The Settlement Represents a Strong Result for the Settlement Class, Particularly Given the Risks and Likely Duration of Ongoing Litigation (Rule 23(e)(2)(C)(i)). ........................................................................ 25

D. The Settlement Treats Settlement Class Members Equitably (Rule 23(e)(2)D)). ................................................................................................ 27

E. The Method of Distributing Relief is Effective (Rule 23(e)(2)(C)(ii)). ............... 28

F. Settlement Class Counsel Will Seek Reasonable Attorneys' Fees and Reimbursement of their Litigation Expenses (Rule 23(e)(2)(C)(iii)). ................. 28

G. There Are No Additional Agreements to Disclose (Rule 23(e)(2)(C)(iv)). .......... 28

III. The Proposed Notice Program Will Provide the Best Notice Practicable and Should Be Approved. ................................................................................... 29

IV. The Court Should Certify the Settlement Class for Settlement Purposes. ....................... 30

A. The Requirements of Rule 23(a) are Satisfied. .................................................. 30

B. The Requirements of Rule 23(b)(3) are Satisfied. ............................................. 32

V. The Court Should Schedule the Final Approval Hearing and Related Dates. ................. 33

CONCLUSION ............................................................................................... 34

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

**Cases**

*Abdallah v. FedEx Corp. Servs., Inc.*,
  No. 16-CV-3967, 2021 WL 979143 (N.D. Ill. Mar. 16, 2021)................................31

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997).........................................................................32, 33

*Anderson v. Weinert Enterprises, Inc.*,
  986 F.3d 773 (7th Cir. 2021) .................................................................30

*Butler v. Sears, Roebuck & Co.*,
  702 F.3d 359 (7th Cir. 2012) .................................................................32

*Carnegie v. Household Int'l., Inc.*,
  376 F.3d 656 (7th Cir. 2004) .................................................................33

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974)............................................................................29

*In re AT&T Mobility Wireless Data Srvs. Sales Litig.*,
  270 F.R.D. 330 (N.D. Ill. 2010).............................................................27

*In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Inj. Litig.*,
  332 F.R.D. 202 (N.D. Ill. 2019).............................................................25

*In re TikTok, Inc,. Consumer Priv. Litig.*
  565 F. Supp. 3d 1076 (N.D. Ill. 2021) ...................................................23

*In re TikTok, Inc., Consumer Priv. Litig.*,
  617 F. Supp. 3d 904 (N.D. Ill. 2022) .....................................................25

*Mangone v. First USA Bank*,
  206 F.R.D. 222 (S.D. Ill. 2001) .............................................................30

*McFields v. Dart*,
  982 F.3d 511 (7th Cir. 2020) .................................................................31

*Prokhorov v. IIK Transp., Inc.*,
  No. 20 CV 6807, 2023 WL 2711599 (N.D. Ill. Mar. 30, 2023) ................33

*Reynolds v. Beneficial Nat'l Bank*,
  288 F.3d 277 (7th Cir. 2002) .................................................................22

## TABLE OF AUTHORITIES
(continued)

**Page**

*Scott v. Dart*,
    99 F.4th 1076 (7th Cir. 2024) .................................................................30

*Smith v. City of Chicago*,
    340 F.R.D. 262 (N.D. Ill. 2021) ............................................................31

*T.K. Through Leshore v. Bytedance Tech. Co.*,
    No. 19-CV-7915, 2022 WL 888943 (N.D. Ill. Mar. 25, 2022)................25

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016)................................................................................32

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)................................................................................30

**Statutes**

18 U.S.C. § 1962(c)-(d) ....................................................................................6

**Court Rules**

Fed. R. Civ. P. 23(a) .........................................................................30, 31, 32

Fed. R. Civ. P. 23(b) ...................................................................29, 30, 32, 33

Fed. R. Civ. P. 23(c) ......................................................................................29

Fed. R. Civ. P. 23(e) ................................................................................. *passim*

Fed. R. Civ. P. 23(h) ......................................................................................28

3085562.2

## INTRODUCTION

The parties have reached a settlement to resolve these related actions on a class-wide basis.[1]  Pursuant to the Settlement, eligible Settlement Class Members will receive payments based on a reasonable approximation of the "interchange fee" overcharges (i.e., the alleged damages) they incurred during the relevant time period, plus interest.  In all, Discover will pay a minimum of $500 million (and perhaps significantly more) to End Merchants, Merchant Acquirers, and Payment Intermediaries to resolve the claims at issue in this litigation.

The Settlement includes detailed notice, claims, and allocation provisions that are thoughtfully designed to reach the affected entities, calculate settlement payment amounts, and ensure that settlement payments are directed to the entities that bore the alleged overcharges. While more elaborate than in a typical class settlement, as discussed herein and in the accompanying papers, these provisions are necessary and appropriate in light of limitations in Discover's own data.

The Settlement is fair, reasonable, and adequate.  It was reached after extensive arm's-length negotiations through a highly-respected mediator, Hon. Jay C. Gandhi (Ret.), and follows substantial investigation by Settlement Class Counsel into the facts and legal issues in this case. For the reasons set forth herein, Plaintiffs respectfully request that the Court preliminarily approve the proposed Settlement, order that notice be disseminated to the Settlement Class under Rule 23(e)(1) pursuant to the parties' proposed Notice Program, and certify the Settlement Class for purposes of the Settlement.

---

[1] A copy of the Class Action Settlement Agreement and Release (the "Settlement" or "Settlement Agreement"), including the Exhibits thereto, is being filed concurrently herewith.  Unless otherwise defined, capitalized terms appearing in this motion shall be defined as provided for in the Settlement Agreement.

## BACKGROUND

I.        **Interchange Fees**

For every Discover credit card transaction, Discover assesses an "interchange fee," a portion of the payment that is calculated as a percentage of the transaction amount (called an "interchange rate"). The interchange rate for a given transaction depends on multiple factors, including the type of Discover card account used. *See* Declaration of Adam J. Levitin, filed herewith ("Levitin Decl."), ¶¶ 33-35. Two categories of Discover accounts that existed during the relevant time period were "Consumer" accounts and "Commercial" accounts. As alleged, the interchange rates applicable to Commercial account transactions were generally higher than for Consumer card accounts. Consumer accounts, in turn, were further divided into "Core," "Rewards," "Premium," and (for some of the relevant time period) "Premium Plus" accounts, each with different corresponding interchange rates. In addition to a variable rate fee applied on the transaction amount, Discover also typically collected a flat per transaction "network fee" (e.g., $0.05 per transaction) that varied based on the Discover card account type. Levitin Decl., ¶¶ 33, 36.

II.       **The Entities Involved in Credit Card Processing and Who Incurred the Alleged Interchange Fee Overcharges**

At least five persons or entities are involved in a typical Discover credit card transaction: (i) the *cardholder*, who makes a payment for a purchase using a credit card; (ii) the cardholder's *issuing bank* (here, Discover Bank), which issues the credit card and maintains the cardholder relationship; (iii) the *payment network* (here, Discover Financial Services), which facilitates the credit card transaction by communicating financial information between the cardholder's issuing bank and the merchant acquirer; (iv) the *Merchant Acquirer* (also known as a "merchant bank," an "acquiring bank," or an "acquirer"), which contracts with the merchant to maintain the

merchant relationship, receive payments from the issuing bank, and pay the merchant; and (v) the ***End Merchant***, which agrees to accept payment by credit card from the cardholder. Levitin Decl., ¶¶ 27-32. In addition, for many Discover credit card transactions, one or more additional Payment Intermediaries are involved in the process. Levitin Decl., ¶¶ 46-53. The most common types of Payment Intermediaries are discussed below.

When a Discover cardholder makes a purchase and pays a merchant using her Discover credit card, the merchant electronically transmits a request to the issuing bank (through the Merchant Acquirer/Payment Intermediary). The issuing bank verifies the information and, if funds are available, authorizes payment less any "interchange fee" and "network fee" that are retained by Discover (the payment network). The most typical Discover card transaction cycle is illustrated below:



1. Cardmember makes purchase at Merchant accepting Discover

**Direct Merchant**
2. Merchant submits transaction to Discover
3. Discover reimburses Merchant for amount of transaction less fees (skip to step 8)

**Indirect Merchant**
4. Merchant submits transaction to Acquirer
5. Acquirer reimburses Merchant for amount of transaction less discount fee
6. Acquirer submits transaction to Discover
7. Discover reimburses Acquirer for amount of transaction less acquirer interchange fee
8. Discover bills Cardmember for amount of transaction
9. Cardmember makes payment to Discover

*This is a simplified illustration of a typical credit card transaction. It does not reflect certain operations and assessment fees, cash or balance transfer transactions, authorizations, disputes or other specifics.

In this typical scenario, where the End Merchant processes transactions via a Merchant Acquirer, the Merchant Acquirer is credited with payment from the issuer (the transaction amount minus the interchange fee and network fee), and the Merchant Acquirer will then credit the End

Merchant's account with the amount of the transaction minus a fee it has negotiated with the End Merchant (called the "discount fee").  Levitin Decl., ¶ 33.

Under this structure, identifying which entity directly incurs Discover's interchange fees—and thus would incur any interchange fee *overcharges* (the alleged damages in this case)—depends on the terms of the business relationship between the End Merchant and the Merchant Acquirer regarding how the discount fee is calculated.  There are three common discount fee pricing structures:  (1) a "flat rate" structure, where the End Merchant pays the Merchant Acquirer a fixed per-transaction discount fee; (2) a "cost-plus" structure, where the End Merchant pays the Merchant Acquirer a discount fee calculated based on the interchange fee plus the network fee and plus a markup; and (3) a "tiered" structure where the End Merchant pays the Merchant Acquirer different fixed rates depending on certain "qualification" criteria. For the second of these structures (i.e., cost-plus), the interchange fee is directly passed on by the Merchant Acquirer to the End Merchant.  For the other two structures, the discount fee paid by the End Merchant is independent of the amount of the interchange fee assessed on the transaction.  Levitin Decl., ¶¶ 37-43.

Not all Discover credit card transactions are limited to the above participants.  For many transactions, a Payment Intermediary is involved as well.  For example, sometimes one merchant (e.g., a franchisor) will serve as the merchant of record for a collection of other affiliated merchants (e.g., franchisees).  In those instances, the Merchant Acquirer will settle transaction funds into the account of the merchant of record, which will then remit the funds to its franchisees or dealers according to their own individually negotiated economic terms.  These economic terms may or may not include an express pass-through of the interchange fee.  As another example, some End Merchants operate through a "marketplace" platform (e.g., AirBnb,

Amazon, DoorDash, eBay, MindBody, Shopify, or Uber), where that platform serves as the merchant of record and will have the relationship with the Merchant Acquirer. The marketplace platform, in turn, will have its own economic relationship with the End Merchant. These economic terms may or may not include an express pass-through of the interchange fee. Another common example is some End Merchants use payment processors (e.g., Square, Stripe, PayPal) to handle their payments card transactions. These processors are not Merchant Acquirers themselves, but instead partner with a Merchant Acquirer (sometimes an affiliate) to accept payments on behalf of the End Merchant. The terms between the processors and downstream End Merchants will vary. Levitin Decl., ¶¶ 46-53.

Finally, a relatively small number of "Direct End Merchants"—typically merchants with large Discover card sales volumes—have direct contractual relationships with Discover, pursuant to which Discover in essence serves the role of Merchant Acquirer (in addition to serving as the payment network). In some instances the entity with the direct relationship with Discover may be the End Merchant; in such cases, the interchange fees are generally borne directly by the End Merchants. In other Discover "direct" scenarios (e.g., franchisor), that entity may be serving as a Payment Intermediary facilitating payments for other Downstream Entities (e.g., franchisees), where the identity of which entity ultimately bears the interchange fee is not known to Discover. Levitin Decl., ¶ 54.

Thus, whether an interchange fee *overcharge* on a given transaction (the alleged damages in this case) was borne by the End Merchant and/or by another entity or entities will vary. Other than for certain entities that have direct processing relationships with Discover, Discover's data does not reflect how the interchange fees are allocated, if at all, among the different possible entities involved. Levitin Decl., ¶¶ 44, 54.

3085562.2

III.     **Procedural History and Counsel's Investigation**

On July 19, 2023, Discover disclosed that from 2007 through 2023, it had systematically misclassified certain "Consumer" credit card accounts as "Commercial" accounts.[2]  As a result, Plaintiffs allege, the interchange fees that Discover assessed on some transactions were higher than such fees would have been had the accounts been correctly classified.

Before Discover's July 2023 announcement, proposed Settlement Class Counsel began investigating reports about card misclassifications by Discover.  Starting the day of Discover's July 2023 announcement, three class action lawsuits were filed: *CAPP, Inc. v. Discover Financial Services*, No. 1:23-cv-04676 ("*CAPP*"); *Lemmo's Pizzeria, LLC v. Discover Financial Services*, No. 1:23-CV-14250 ("*Lemmo's*"); and *Support Animal Holdings, LLC v. Discover Financial Services*, No. 1:23-cv-15297 ("*Support Animal*").  The *CAPP* action was filed in the Northern District of Illinois and assigned to this Court.  The *Lemmo's* and *Support Animal* actions were originally filed in the Central District of California and subsequently transferred to this District.  *See Lemmo's*, ECF Nos. 1, 21; *Support Animal*, ECF Nos. 1, 14.  Collectively, the lawsuits allege claims under the federal Racketeer Influenced and Corrupt Organizations ("RICO") statute, 18 U.S.C. § 1962(c)-(d), and under state consumer protection statutes and common law.  On January 8, 2024, the *Lemmo's* and *Support Animal* cases were deemed related to the *CAPP* case and assigned to this Court.  *See CAPP*, ECF No. 36.

Prior to Discover's July 2023 announcement, and continuing after these cases were on file, proposed Settlement Class Counsel conducted an extensive investigation into the facts at issue in this case, including researching SEC filings and other publicly available information

---

[2] *See* Discover Financial Services Form 8-K at pdf page 6, available at https://d18rn0p25nwr6d.cloudfront.net/CIK-0001393612/a4db3f93-d8e8-44b2-a895-03b271e7be60.pdf (last accessed Aug. 25, 2024).

about the issue, and speaking with and analyzing documents provided by numerous affected

entities. Counsel also conducted extensive legal research regarding the potential claims and legal

theories for this litigation. In addition, party discovery into whether an obligation to arbitrate the

claims alleged had commenced. Joint Declaration of Roger Heller, Taras Kick, and Catherine

Pratsinakis in Support of Motion for Preliminary Approval of Class Action Settlement, filed

herewith ("Joint Decl.") ¶¶ 14, 22.

## IV.     **Settlement Negotiations and Confirmatory Discovery**

In early 2024, the parties agreed to explore a potential resolution of these cases, and the

Court granted the parties' joint motions to stay the litigation pending mediation. *See CAPP*, ECF

Nos. 42, 44, 46, 48, 50, 52, 54. Over the course of the next several months, the parties engaged

in extensive, arm's-length settlement negotiations, including three full-day in-person mediation

sessions and numerous follow up meetings and conversations with the Hon. Jay C. Gandhi (Ret.)

of JAMS. In addition, while the parties were engaged in settlement negotiations, the parties

simultaneously engaged in discovery for purposes of mediation, exchanging information

throughout the mediation process. Through these efforts, and with the ongoing assistance of

Judge Gandhi, the parties were able to reach an agreement in principle and thereafter worked on

drafting the written Settlement Agreement and other settlement documents that are presented to

the Court for its consideration. Joint Decl. ¶¶ 19-21.

Continuing after the execution of the Settlement, Plaintiffs conducted confirmatory

discovery on, among other areas, the fee overcharges, the methodology employed to calculate the

estimated overcharges, the reclassification underlying the methodology, Discover's pertinent

data and database, and data limitations. Plaintiffs retained and worked closely with multiple

industry and data experts in connection with these efforts. Joint Decl. ¶ 23.

## V.     Summary of the Settlement Agreement

### A.     The Settlement Class

The Settlement Class is defined as:

> All End Merchants, Merchant Acquirers, and Payment Intermediaries involved in processing or accepting a Misclassified Card Transaction during the Relevant Period [January 1, 2007 through December 31, 2023]. The entities and individuals listed on Exhibit A to the Settlement Agreement are excluded from the Settlement Class, even if they meet the foregoing definition.

Settlement § 2.69, Ex. A.[3] As reflected in the definition, broadly speaking, Settlement Class Members fall into three categories: (1) "End Merchants" that "accepted a Discover Bank-issued credit card directly from a person as payment in return for the delivery of goods or services[,]" Settlement § 2.20; (2) "Merchant Acquirers" that "had an agreement with Discover to facilitate" credit card transactions (and were characterized by Discover's rules and regulations as "Acquirers"), Settlement § 2.30; and (3) "Payment Intermediaries" that processed credit card transactions on behalf of End Merchants or others, but that are neither Merchant Acquirers nor End Merchants, Settlement § 2.52.

### B.     Overview of Steps for Determining Settlement Payment Amounts and Payees

As summarized below, the Settlement provides a series of steps to determine Payment Eligible Settlement Class Members and the Settlement Payment amounts for each of them. Broadly speaking, the steps are as follows:

1.    The estimated fee overcharges plus interest (called the "MID Amount") are calculated for each "MID" (i.e., the "merchant identification number" applicable to an End

---

[3] The excluded entities listed in Exhibit A to the Settlement are entities that have agreed or agree to individual settlements about this issue with Discover between the time the *CAPP* action was filed and the date of the Preliminary Approval Order.

Merchant) using Discover's available data and pursuant to the Methodology set forth at Exhibit B to the Settlement.

2.  The notice and claims processes are implemented to identify the Payment Eligible Settlement Class Members and gather additional information that will be used by the Settlement Administrator to help determine how the MID Amount for each MID is to be allocated among the entities associated with that MID (i.e., determine which entity or entities incurred the alleged fee overcharges for that MID).

3.  The Settlement Administrator processes claims and the other information obtained through the claims process. The Settlement Administrator validates claims, and allocates the MID Amounts among the entities involved.

4.  Payment Eligible Settlement Class Members are notified of their Total Allocated MID Amounts and given an opportunity to provide additional information, after which process the Settlement Administrator calculates the final Settlement Payment amount for each Payment Eligible Settlement Class Member and the Settlement Payments are distributed.

Further details and explanation are provided below.

### C.    Calculating the MID Amounts for Each MID

The Settlement includes, at Exhibit B thereto, a detailed formula (the "Methodology") for calculating the MID Amount associated with each MID that had an identified misclassified card transaction from 2016 to 2023.[4] The calculations under the Methodology are performed using Discover's available data. The Methodology is designed to estimate for each affected MID the delta between the interchange fees Discover assessed on Misclassified Card Transactions, and

---

[4] Discover does not have data sufficient to identify misclassified card transactions prior to 2016.

what it would have assessed on those transactions had the cards been correctly classified. Specifically, an "Annual MID Amount" is calculated for each such MID for each year, pursuant to the steps set forth in the Methodology. Those Annual MID Amounts are added up, and then interest is added to the total (Settlement, Ex. B §§ 1.13, 2.4) to arrive at the total MID Amount for each MID.

It should be noted that the Methodology includes some extrapolations to account for certain limitations in Discover's data. Discover lacks reliable MID-level data (including data about whether a MID had any misclassified card transactions) for the period before 2016. As a result, for the years prior to 2016, the Methodology extrapolates Annual MID Amounts for each such year (i.e., 2007 through 2015) based on Discover's data for that MID for 2016 (i.e., the earliest year for which reliable data is available) and the proportion of total Discover card transaction volume for the year in question in relation to such volume for 2016. Settlement, Ex. B §§ 1.17, 2.2, 2.3.[5] Additionally, to allocate an individual MID's misclassified "Commercial" card transactions among the different categories of "Consumer" cards ("Rewards", "Premium", and "Premium Plus") in order to calculate expected fees, the Methodology uses Discover's aggregate data from 2022 that was used to reclassify all misclassified "Commercial" accounts. The Methodology then applies the aggregate reclassification percentages to the individual MID's misclassified transactions. Settlement, Ex. B §§ 1.18-1.20.

---

[5] The formula used to calculate Annual MID Amounts for years 2011-2015 (Settlement, Ex. B § 2.2) is slightly different than that for years 2007-2010 (Settlement, Ex. B § 2.3), owing to the fact that one of the "Consumer" card categories ("Premium Plus") did not exist prior to 2011. It should further be noted that for some MIDs that did not exist all the way back to 2007, the Methodology will calculate Annual MID Amounts for years before that MID existed, however as discussed below, the Settlement's claim and information gathering processes will be used to limit Settlement Payments for those MIDs to those years the MID existed.

-10-

### D.    Notice Program and Claim Process

The Settlement includes a carefully designed notice and claims process to account for certain limitations in Discover's data (including that Discover in most cases does not know which entity bore the interchange fees), and to ensure that Settlement Payments are properly calculated and directed to the entities that bore the alleged fee overcharges.  As summarized below, the notice and corresponding gathering of information will be implemented by the Settlement Administrator in stages, and the steps and information that Settlement Class Members are required to provide will vary somewhat depending on the type of entity they are.  The process is thoughtfully designed to ensure that the Settlement Administrator receives the information it needs to reasonably allocate and calculate payments, while minimizing to the extent reasonably possible the burden on each claimant.

### 1.    Notice Program

#### a.    Initial Data Transfer from Discover

Following entry of the Preliminary Approval Order, Discover will provide the Settlement Administrator with contact information and other data that Discover has regarding identified Settlement Class Members and potential Settlement Class Members.  Settlement §§ 3.3.3.1, 3.3.3.2, 5.3.3; Notice Program, 6-7.[6]

#### b.    Initial Direct Mail and Email Notice

Within 90 days after entry of the Preliminary Approval order, the Settlement Administrator will send direct mail notice to: (a) known Settlement Class Members (i.e., entities associated with a MID with an identified Misclassified Card Transaction between 2016 and

---

[6] The parties' proposed Notice Program, which was prepared by Settlement Class Counsel and Discover, in conjunction with the proposed Settlement Administrator, is attached as Exhibit 2 to the Declaration of Cameron R. Azari, Esq., filed herewith ("Azari Decl.").

2023); and (b) potential other Settlement Class Members (i.e., entities associated with a MID opened before 2016 that processed at least one Discover transaction since January 1, 2016 but for which there are no identified Misclassified Card Transactions between 2016 and 2023).[7]

Within the same time frame, the Settlement Administrator will also send direct email notice to these same groups to the extent email address information is available. Notice Program, 7-9.

Six different forms of mail/email notice will be utilized, corresponding to the different categories of Settlement Class Member entities (described below), to inform recipients of the steps they must take and information they must provide in order to receive a Settlement Payment (which, as discussed below, vary somewhat by entity type). Notice Program, 6-11, Attachments 1a-2f (proposed forms of mail/email notice).

The email notices will include hyperlinks to, and the mailed notices will prominently list the URLs of, the Settlement Website page where Settlement Class Members can submit claims electronically. Industry-standard steps will be taken to update contact information and to re-send mailed and emailed notices that are returned as undeliverable/bounce-back. Notice Program, 10-11.

### c. Additional Direct Notice Efforts

As discussed below, the Settlement Administrator will gather information through the notice and claims process from Merchant Acquirers and Payment Intermediaries about the

---

[7] The reason for including this second category is that these entities may have had a Misclassified Card Transaction between 2007 and 2015, but Discover does not have data to know either way. The reason for limiting direct mail notice to this group, to those that last processed a Discover transaction in 2016 or later, is that if an entity last processed a Discover card transaction before then, there is a high likelihood that entity no longer exists and/or that the contact information for that entity in Discover's records is no longer valid.

Downstream Entities for which they processed card transactions. It is anticipated that this information will allow the Settlement Administrator to: (a) identify additional Settlement Class Members and potential Settlement Class Members that are not identifiable from Discover's own records; and/or (b) identify more updated contact information for some entities that were sent the initial direct notice. The Settlement Administrator may also receive additional identifying/contact information from other sources as well. Notice Program, 7. Accordingly, the proposed Notice Program provides that, within 210 days after the entry of the Preliminary Approval Order, the Settlement Administrator will send a second wave of direct mail/email notices (using the same forms as for the initial direct notices) based on the additional information received. Notice Program, 9. The Notice Program further contemplates that additional identifying and contact information may be obtained by the Settlement Administrator even after the second wave of direct notices are sent and provides that the Settlement Administrator will continue to send direct notices up through shortly before the Settlement Claim Deadline. Notice Program, 9.

### d.       Media and Internet Notice Program

In addition to direct mail and email notice, the parties have agreed to an extensive internet, radio, and print media notice campaign, designed by the Settlement Administrator in consultation with Settlement Class Counsel and Discover. The program is robust and thoughtfully designed to target potential Settlement Class Members here (i.e., U.S. business owners). As detailed in the Notice Program, it will include, *inter alia*, extensive internet and social-media notice, notice via streaming/satellite services, print media, press releases, and notice via pertinent business and trade associations. Notice Program, 11-12; *see also* Azari Decl. ¶ 21. (discussing the substantial expected reach of this aspect of the Notice Program).

-13-

#### e.     **Reminder Notices**

The Settlement Administrator will also send two rounds of reminder email notices in advance of the Settlement Claim Deadline to Settlement Class Members that have not yet submitted claims. Notice Program, 9-10.

#### f.     **Settlement Website and Toll-Free Number**

The Settlement Administrator will establish and maintain a case-specific Settlement Website, at www.DiscoverMerchantSettlement.com, where Settlement Class Members can obtain additional information, view/download a long-form notice[8] and key case documents, and submit claim forms and other information electronically. Notice Program, 33-34. The Settlement Administrator will also maintain an informational toll-free telephone number where Settlement Class Members can speak with a live agent, obtain additional information, and request a hard copy claim form be mailed to them. Notice Program, 34.

#### 2.     **Claims Process**

With limited exceptions, Settlement Class Members will be required to submit claims and/or provide other additional information to the Settlement Administrator to receive a payment under the Settlement. Settlement § 3.3. The precise steps and informational requirements vary based on the type of Settlement Class Member, tailored in each instance to: obtain the information necessary for the Settlement Administrator to reasonably validate claims and determine Settlement Payment amounts and allocations, while minimizing to the extent reasonably possible the burden on claimants. The following summarizes what each group needs to submit to receive a payment:

---

[8] The parties' proposed form of long-form notice is attached as Attachment 5 to the Notice Program.

- ***Indirect End Merchants***.  These are End Merchants that processed Discover cards through a third party (e.g., through a Merchant Acquirer or Payment Intermediary) and not through a direct relationship with Discover.  Most Settlement Class Members are in this category.  These entities will be required to submit a claim to receive a payment.  Settlement § 3.3.4.  The primary reason these entities will need to submit a claim is that Discover lacks information for these MIDs about which entity or entities bore the overcharges at issue and does not know which entity to pay.  Levitin Decl., ¶¶ 43-44, 61-64, 66(d).

- ***Unmanaged Active Direct End Merchants***.  These are entities with direct processing arrangements with Discover and that currently/recently accepted Discover cards, but which do not have dedicated relationship managers.  They will be automatically deemed Payment Eligible for years 2016 to 2023 and will be mailed a Settlement Payment for these years without the need to file a claim.  To receive a settlement payment for years 2007 to 2015, however, these entities will need to file a claim.  The reason is that Discover does not have sufficient pre-2016 data, and so these entities must confirm when they started accepting Discover cards and confirm that they are the correct entity to receive any payment for those years.  Settlement §§ 3.3.1, 3.3.3; Levitin Decl., ¶¶ 64, 66(b).

- ***Managed Active Direct End Merchants.***  These are the same as the prior group, except that they interact with Discover through a dedicated client relationship manager.  Settlement § 2.28.  There are 392 entities in this category.  As with the prior group, they will be automatically deemed Payment Eligible for years 2016 to 2023.  However, to receive payments for these years they must provide information about where to send the payment and confirm that they are the correct entity to receive the payment (i.e., because Discover does not know whether these entities passed on the fees to another downstream entity that Discover does not have a direct relationship with).  The Settlement Administrator will make multiple efforts, in advance of the Settlement Claim Deadline, to reach out to these entities to obtain such information.  As with the prior group, to receive a settlement payment for years 2007 to 2015, these entities will need to file a claim.  Settlement §§ 3.3.2–3.3.3; Levitin Decl., ¶¶ 62, 64, 66(a).

- ***Inactive Direct End Merchants.***  These are End Merchants that once had direct processing relationships with Discover but either no longer have a direct processing relationship with Discover or have not accepted a Discover card recently.  These entities will be required to submit a claim to receive a payment.  Settlement § 3.3.4.  The primary reason that is necessary and reasonable, even for years 2016-2023, is that Discover lacks information for these MIDs about which entity or entities bore the overcharges at issue and thus does not know which entity to pay.  Levitin Decl., ¶¶ 62, 64, 66(c).

- ***Payment Intermediaries*** and ***Merchant Acquirers*** each must take two steps to receive a settlement payment.  First, they must file a timely claim.  Second, they must provide additional information ("Payment Intermediary Information" and "Merchant Acquirer Information," respectively) identifying the Downstream Entities for the MIDs they are associated with and, for each such MID, the corresponding pricing arrangements/which

entities bore the interchange fees.[9]  Again, the primary reason that is necessary is that Discover lacks information, for these MIDs, about which entities bore the overcharges at issue.  Settlement §§ 2.31, 2.53, 3.3.5–3.3.6; Levitin Decl., ¶¶ 44, 54, 63, 66(e) & (f).

The proposed claim forms are attached as Attachments 3a, 3d, and 3e to the Notice Program.

Claims may be submitted electronically via the Settlement Website or by mail.  With respect to online claims, the direct mail and email notices will include unique IDs and PIN numbers, which will allow for pre-population of certain data fields with information available to the Settlement Administrator.  Email notices will include links to the webpage where claims can be submitted electronically, and mailed notices will include hard copy claim forms and instructions for how to submit claims electronically.

### E.   Allocation of MID Amounts

For each MID where there is one or more MID Claimant (i.e., one or more entity that submitted a timely and valid claim), the Settlement Administrator will determine the Allocated MID Amount attributable to each MID Claimant for that MID.  Broadly speaking, the Settlement Administrator's task will be to determine the extent, if any, that each such MID Claimant bore the interchange fee overcharges associated with that MID.  In doing so, the Settlement Administrator will consider all information made available to it, including by claimants in their claim forms and otherwise, Merchant Acquirer Information and Payment Intermediary Information submitted to or otherwise obtained by the Settlement Administrator, and information provided by Discover regarding payments made or proposed by Discover outside of the settlement to resolve the issues asserted in this litigation (e.g., to certain excluded entities and

---

[9] To the extent a Merchant Acquirer or Payment Intermediary does not timely provide the required information, the Settlement Administrator will take additional steps to try to obtain such information through commercially reasonable means (since that information will assist with supplemental direct notice and with calculating and allocating settlement payments).  Settlement § 3.3.7.

opt-outs), and any other pertinent information the Settlement Administrator is provided. The Settlement provides guidelines for the Settlement Administrator for this process. Settlement § 3.4. If the Settlement Administrator cannot independently calculate the Allocated MID Amount for any MID, the Settlement Administrator will consult with Discover and Settlement Class Counsel regarding how to properly allocate the MID Amount among all MID Claimants for that MID. Settlement § 3.4.4.

### F. Calculation of Settlement Payments

Pursuant to Sections 3.5.2 and 3.5.3 of the Settlement, the Settlement Payment amount for each Payment Eligible Settlement Class Member will be calculated by the Settlement Administrator as 100% of that Payment Eligible Settlement Class Member's Total Allocated MID Amount—i.e., the total of all of their Allocated MID Amounts for all MIDs associated with that Payment Eligible Settlement Class Member[10] (limited to the years during which they accepted or processed Discover-issued credit cards),[11] subject to the following potential adjustments:

*Settlement Base Payments*. If a Payment Eligible Settlement Class Member's total Settlement Payment (for any and all associated MIDs) would otherwise be calculated as less than $10.00, that Settlement Class Member will receive a Settlement Base Payment, so that the Settlement Class Member's total Settlement Payment will equal $10.00,[12] provided that the total

---

[10] Settlement Class Members may be associated with more than one MID.

[11] This will include any Allocated MID Amounts they are entitled to without the need to submit a claim (i.e., for years 2016-2023 for Unmanaged Active Direct End Merchants and eligible Managed Active Direct End Merchants).

[12] For clarity, Settlement Class Members who submit valid claims and for whom the Settlement Administrator calculates $0.00 Allocated MID Amounts will be entitled to the Settlement Base Payment. That includes Settlement Class Members who submit otherwise valid claims for MIDs that did not exist during the 2016-2023 time frame (i.e., that only existed during 2007-2015, for

amount of all Settlement Base Payments Discover is obligated to pay does not exceed $50 million (the "Settlement Base Payment Maximum"). Settlement § 3.5.4. If the total amount of all Settlement Base Payments Discover is obligated to pay exceeds $50 million, the amount of each Settlement Base Payment will be reduced on a pro rata basis until the total amount of Settlement Base Payments reaches the Settlement Base Payment Maximum. *Id*. § 3.5.4.3.

*Minimum Total Class Payout*. Under the terms of the Settlement, Discover has agreed to pay affected entities a total of no less than $500 million (the "Minimum Total Class Payout"). Specifically, if the total of all Settlement Payments due to all Payment Eligible Settlement Class Members, together with the Adjusted Total Non-Claimant Payment,[13] does not exceed $500 million, then each Payment Eligible Settlement Class Member's Settlement Payment will be increased on a pro rata basis until such total of such payments reaches the Minimum Total Class Payout (i.e., $500 million). Settlement § 3.5.5.

*Total Settlement Payout*. Separately, the Settlement limits the total amount Discover must pay to affected entities by imposing a ceiling on payments to all affected entities. Specifically, the Settlement defines the "Total Settlement Payout" as the sum of: (a) $1,093,735,923 (which is the total of all MID Amounts calculated under the Methodology, other than interest to be calculated for partial year 2024); plus (b) interest calculated under the

---

which years Discover does not have data identifying the MIDs associated with Misclassified Card Transactions).

[13] Since the commencement of these lawsuits, Discover has engaged and continues to engage in discussions with certain Settlement Class Members (or entities that would otherwise meet the definition of Settlement Class Members) to resolve the claims raised by these lawsuits on an individual basis. Certain payments made or agreed to by Discover to resolve such claims (defined as "Non-Claimant Payments" in the Settlement), up to the Total Allocated MID Amounts for those entities, will be considered in determining whether Settlement Payments are to be adjusted to ensure that Discover's total payments to affected entities meet the minimum threshold (i.e., the Minimum Total Class Payout) and do not exceed the maximum limit (i.e., the Total Settlement Payout). Settlement §§ 2.2, 3.5.1.

Methodology for partial year 2024. Settlement § 2.79. If the total of all Settlement Payments due to all Payment Eligible Settlement Class Members, together with the Adjusted Total Non-Claimant Payment,[14] exceeds the Total Settlement Payout figure, then each Payment Eligible Settlement Class Member's Settlement Payment would be reduced on a pro rata basis until the total of such payments reaches the Total Settlement Payout figure. Settlement § 3.5.6.

### G. Notice of Total Allocated MID Amounts

Prior to finalizing the calculation of Settlement Payments and sending payments, the Settlement Administrator will send each Payment Eligible Settlement Class Member notice of their Total Allocated MID Amount (and, if applicable, their estimated Base Payment Amount). The Settlement Class Member will then have thirty-five (35) days to provide additional information for the Settlement Administrator's further consideration regarding allocations. Settlement § 5.12.

### H. Funding of the Settlement Escrow Account and Distribution of Settlement Payments

The Settlement provides a schedule for Discover to fund the Settlement Escrow Account from which the Settlement Payments will be issued. First, no later than 30 days after entry of the Final Approval Order, Discover will pay $100 million (the "First Funding Amount") into the Settlement Escrow Account. Second, no later than 10 days after the Effective Date, Discover will pay into the Settlement Escrow Account the difference between the First Funding Amount and a reasonable estimate of the aggregate total of all of Settlement Payments for all Payment Eligible Settlement Class Members, as determined by the Settlement Administrator with input from the Parties (the "Second Funding Amount"). Finally, within 190 days after the Effective

---

[14] *See supra* n.13.

Date, Discover will fund any additional amounts needed to make the Settlement Payments as finally calculated (or receive a refund of any overpayment as applicable). Settlement § 5.11. Interest earned on funds held in the Settlement Escrow Account will be added on a pro rata basis to, and included in, the Settlement Payments issued.

Within 195 days after the Effective Date (the "Payment Date"), Settlement Payments will be issued to Payment Eligible Settlement Class Members. Settlement Payments will be made by mailed check or, at the Payment Eligible Settlement Class Member's election and provision of account information, electronic ACH. Settlement checks will be valid for 120 days. For mailed checks, additional efforts will be made to re-mail checks that are returned undeliverable. Settlement § 5.13.

### I. **Residual Settlement Payment Funds**

If there are any Settlement Payment amounts that remain in the Settlement Escrow Account 210 days after the Payment Date—consisting of Settlement Payment checks that were successfully delivered but not timely negotiated and Settlement Payments that the Settlement Administrator determines are undeliverable or that otherwise cannot be effectuated following reasonable efforts by the Settlement Administrator to contact and obtain from the Payment Eligible Settlement Class Member alternative payment information (collectively, "Residual Funds")—such Residual Funds will be distributed to a *cy pres* recipient to be proposed by Settlement Class Counsel with input from Discover, subject to Court approval. Settlement § 5.14.

### J. **Release**

In exchange for the relief provided by the Settlement, Settlement Class Members will release Discover and its affiliates for any claims about the issues in this case. Settlement §§ 2.57, 2.58, 3.7.

-20-

### K. Opt-Out and Objection Procedures

Any person or entity within the Settlement Class definition may request to be excluded from the Settlement Class by sending a signed request for exclusion to the Settlement Administrator postmarked by the Opt-Out Deadline that includes the information prescribed by the Settlement Agreement and detailed in the long-form notice.

Any Settlement Class Member that does not submit a timely and valid exclusion request may object to the Settlement, Settlement Class Counsel's application for attorneys' fees and expenses, and/or the request for service awards. To be considered, an objection must be in writing, must be filed with or mailed to the Court and mailed to the Settlement Administrator, must be filed/postmarked by the Objection Deadline, and must include the information prescribed by the Settlement Agreement and detailed in the long-form notice. Settlement §§ 5.7, 5.9. The parties propose that the Opt-Out Deadline and Objection Deadline be set 270 days after the Court enters the Preliminary Approval Order.

### L. Attorneys' Fees and Expenses; Service Awards

Settlement Class Counsel will apply to the Court for an award of reasonable attorneys' fees in an amount not to exceed $25 million, and for reimbursement of litigation expenses in an amount not to exceed $1 million. Settlement Class Counsel will also apply for service awards for the five Settlement Class Representatives of up to $7,500 each to compensate them for their effort and commitment on behalf of the Settlement Class in this litigation. Any attorneys' fees, expenses, and service awards awarded by the Court will be paid separately by Discover on top of (i.e., in addition to) the Settlement Payments that are made to Payment Eligible Settlement Class Members. Settlement Class Counsel's application for attorneys' fees, expenses, and service awards will be filed no later than 200 days after the Court enters the Preliminary Approval Order (i.e., 70 days before the proposed Opt-Out Deadline and Objection Deadline). Settlement § 3.6.

**M.** **Settlement Administrator; Notice and Administration Costs.**

The parties propose that the Court appoint Epiq Class Action & Claims Solutions, Inc. ("Epiq") to serve as Settlement Administrator.  Epiq has extensive experience administering complex class settlements, notice programs, and claims processes, and is uniquely qualified to serve as Settlement Administrator in this case given its experience administering related litigation involving card processing.  *See* Azari Decl. ¶¶ 4-5.

The fees and costs of the Settlement Administrator in implementing the Notice Program, obtaining information, processing and validating claims, determining allocations, sending Settlement Payments, and performing the other administrative tasks described in the Settlement, will be paid separately by Discover on top of (i.e., in addition to) the Settlement Payments that are made to Payment Eligible Settlement Class Members.  Settlement §§ 2.44, 4.

## ARGUMENT

**I.** **Overview of the Class Settlement Approval Process**

Pursuant to Rule 23(e), a class action settlement must be approved by the court before it can become effective.  *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279 (7th Cir. 2002). The process for court approval is comprised of three principal steps:

(1)     preliminary approval of the proposed settlement and direction to disseminate notice to the class, after submission to the court of a written motion for preliminary approval;

(2)     dissemination of notice to the class; and

(3)     a final approval hearing, at which evidence and argument concerning the fairness, adequacy, and reasonableness of the settlement are presented.

By this Motion, Plaintiffs respectfully ask the Court to take the first step in the approval process and enter an order preliminarily approving the Settlement and directing class notice, pursuant to the parties' proposed Notice Program, under Rule 23(e)(1).

Preliminary approval should be granted, and notice directed to the class, if the Court determines that it is likely to: (i) approve the proposed settlement as fair, reasonable, and adequate, after considering the factors outlined in Rule 23(e)(2); and (ii) certify the settlement class after the final approval hearing. *See* Fed. R. Civ. P. 23(e)(1).

Here, the proposed Settlement meets the standards for preliminary settlement approval, the proposed Notice Program meets all applicable requirements, including due process and Rule 23, and the proposed Settlement Class meets the standards for certification.

## II.     <u>The Proposed Settlement Meets the Standards for Preliminary Approval.</u>

Preliminary approval is appropriate where the Court determines it "will likely be able to" to finally approve the settlement as "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(1)(B)(i), 23(e)(2).  Specifically, Rule 23(e)(2) directs courts to consider whether:

(A)     the class representatives and class counsel have adequately represented the class;

(B)     the proposal was negotiated at arm's length;

(C)     the relief provided for the class is adequate, taking into account:

    (i)      the costs, risks, and delay of trial and appeal;

    (ii)     the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

    (iii)    the terms of any proposed award of attorney's fees, including timing of payment; and

    (iv)     any agreement required to be identified under Rule 23(e)(3); and

(D)     the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). [15]  As explained below, consideration of these factors supports granting preliminary approval of the Settlement and directing notice to the Settlement Class.

---

[15] These factors overlap significantly with, and can be analyzed in tandem with, the factors that Seventh Circuit courts have traditionally considered under Rule 23(e)(2). *See In re TikTok, Inc,. Consumer Priv. Litig.* 565 F. Supp. 3d 1076, 1083-84 (N.D. Ill. 2021) (citing *Wong v. Accretive Health, Inc.*, 773 F.3d 859, 863 (7th Cir. 2014)).

**A.** **Plaintiffs and Settlement Class Counsel Have and Continue to Zealously Represent the Settlement Class (Rule 23(e)(2)(A)).**

Plaintiffs and proposed Settlement Class Counsel have pursued this action on behalf of the Settlement Class with vigor and dedication. Fed. R. Civ. P. 23(e)(2)(A). As detailed above and in the accompanying Joint Declaration, Settlement Class Counsel thoroughly investigated the factual and legal issues involved, conducted substantial confirmatory discovery, retained and worked with multiple experts, and vigorously represented the Settlement Class throughout the lengthy settlement negotiations and drafting process which lasted several months and required resolution of numerous complex issues. Joint Decl. ¶¶ 14-23. Likewise, Plaintiffs have been actively engaged—they each provided pertinent information and documents, reviewed pleadings, and communicated regularly with Settlement Class Counsel up to and including evaluating and approving the proposed Settlement. Joint Decl. ¶ 35.

**B.** **The Settlement Is the Product of Arm's-Length Negotiations (Rule 23(e)(2)(B)).**

The Settlement presented for the Court's consideration is the product of extensive, arm's-length negotiations through an experienced and highly regarded mediator, Hon. Jay C. Gandhi (Ret.) of JAMS. That included three separate in-person, full-day mediation sessions with Judge Gandhi over the course of multiple months, and numerous additional meetings and calls (at times, multiple per day). Prior to the mediation sessions, the parties submitted mediation briefs and supplemental submissions and provided and analyzed pertinent data and information relevant to evaluating, valuing, and resolving the claims. After the parties initially reached an agreement in principle, the parties continued to work exhaustively to negotiate and prepare the written settlement agreement, as well as working on the Notice Program, forms of notice, claim forms and process, among other details. The product of those extensive efforts is reflected in the Settlement and other settlement papers. At all times, the settlement negotiations were

-24-

adversarial, non-collusive, and conducted at arm's-length. Joint Decl. ¶¶ 19-21; *see also In re TikTok, Inc., Consumer Priv. Litig.*, 617 F. Supp. 3d 904, 934 (N.D. Ill. 2022) (identifying third-party mediation and arm's-length negotiation as "indicia of trustworthiness . . . work[ing] against any suggestion of impropriety").

### C.  The Settlement Represents a Strong Result for the Settlement Class, Particularly Given the Risks and Likely Duration of Ongoing Litigation (Rule 23(e)(2)(C)(i)).

"The most important factor relevant to the fairness of a class action settlement is . . . the strength of plaintiff's case on the merits balanced against the amount offered in the settlement." *In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Inj. Litig.*, 332 F.R.D. 202, 217-18 (N.D. Ill. 2019) (quoting *Synfuel Techs, Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006)). Courts instruct that in considering this factor, "parties must compromise to reach a settlement" and, thus, "courts need not—and indeed should not—'reject a settlement solely because it does not provide a complete victory to plaintiffs." *T.K. Through Leshore v. Bytedance Tech. Co.*, No. 19-CV-7915, 2022 WL 888943, at *14 (N.D. Ill. Mar. 25, 2022) (quoting *In re Capital One Tel. Consumer Prot. Act. Litig.*, 80 F. Supp. 781,790 (N.D. Ill. 2015).

The Settlement here represents a very strong result for the Settlement Class. Pursuant to the Settlement, eligible Settlement Class Members are expected to receive payments calculated based on 100% of their Total Allocated MID Amounts (an approximation of the fee overcharges they incurred during the relevant time period, plus interest).[16] Moreover, while a claim is

---

[16] Settlement Payment amounts are subject to potential pro rata increase or reduction (i.e., based on the Minimum Total Class Payout and Total Settlement Payout provisions), however given that the Total Settlement Payout figure is based on the total of all MID Amounts calculated under the Methodology (including interest), *see* Settlement § 3.5.6, it is unlikely there will be a significant, if any, pro rata decrease to the Settlement Payment amounts. Plaintiffs note that the exact amount of the "Total Settlement Payout" (i.e., the ceiling) is not known because it will

required for most Settlement Class Members, the Settlement and notice/claims processes are well crafted to notify Settlement Class Members, encourage claims, and limit what is required of claimants to what is reasonably necessary for the Settlement Administrator to validate claims and calculate and allocate payment amounts in light of the limitations of Discover's data. Further, the Settlement includes a "floor" (i.e., Minimum Total Class Payout) pursuant to which Discover will in all events pay no less than $500 million to affected entities for the misclassification issue in this litigation (inclusive of payments under the Settlement as well as any individual settlements Discover reaches with such entities). Settlement § 3.5.5.

This is a strong result for the Settlement Class, particularly given the substantial risks and challenges of continued litigation. Discover planned to seek to compel arbitration of Plaintiffs' claims, which if successful could, alone, have ended these cases. Discover has also made clear it would vigorously defend this case on the merits. Among other issues, Discover disputes that its internal account classification system created a legal obligation to the Settlement Class. Moreover, Discover has made clear that it would oppose certification of a litigation class. Discover's data limitations, along with the lack of ready access to the different contracts between Merchant Acquirers and End Merchants, would have created complications and challenges for measuring damages and obtaining relief for Settlement Class Members absent a settlement. Even if Plaintiffs were able to overcome these challenges, and prevail at trial on the merits, they would have faced an inevitable appeal.

While Plaintiffs absolutely believe they could overcome these challenges, they are indicative of the risks that Plaintiffs and the proposed Settlement Class would face if the

---

include interest for partial year 2024 that cannot yet be calculated; however, the total amount, including that partial year 2024 interest, will be in excess of $1.1 billion. Settlement § 2.79.

-26-

litigation were to continue. The proposed Settlement provides substantial, appropriately-tailored relief while allowing Settlement Class Members to avoid the risks of unfavorable, and in some cases dispositive, rulings on these and other issues.

Another major benefit of the Settlement is that it helps the Settlement Class avoid further delay in obtaining relief. Proceeding with the litigation could add years to the resolution, given the legal and factual issues raised and likelihood of appeals. *In re AT&T Mobility Wireless Data Srvs. Sales Litig.*, 270 F.R.D. 330, 347 (N.D. Ill. 2010) ("Even if Plaintiffs were to succeed on the merits at some future date, a future victory is not as valuable as a present victory"). Avoiding further delay is particularly beneficial in this case, given the alleged overcharges occurred as many as 17 years ago, meaning that as time passes, it is going to get harder to track down and pay entities in the Settlement Class.

### D. The Settlement Treats Settlement Class Members Equitably (Rule 23(e)(2)D)).

The Settlement "treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). The MID Amounts and payments will be calculated pursuant to the same Methodology and allocation process, with each recipient's Settlement Payment based on the approximate interchange fee overcharges they incurred during the relevant time period as best determined by the Settlement Administrator using all the available information. While the claim and informational requirements do vary by entity type, those differences are fair and equitable, and indeed, as discussed above, are necessary for the Settlement Administrator to make eligibility, calculation, and allocation determinations in light of the limitations of Discover's own data.

**E.**     **The Method of Distributing Relief is Effective (Rule 23(e)(2)(C)(ii)).**

The method for distributing the settlement payments—direct payments via mailed checks or (at the claimant's election) electronic ACH—further supports the reasonableness of the Settlement.  The utilization of the Settlement Base Payment will also help ensure that none of the payments distributed are negligible and that recipients are likely to negotiate their payment checks.  Moreover, the claims forms and claims process are carefully designed to minimize the burden on claimants.

**F.**     **Settlement Class Counsel Will Seek Reasonable Attorneys' Fees and Reimbursement of their Litigation Expenses (Rule 23(e)(2)(C)(iii)).**

Settlement Class Counsel will move the Court for an award of reasonable attorneys' fees in an amount not to exceed $25 million, and for reimbursement of their litigation expenses in an amount not to exceed $1 million.  Any fees and expenses awarded by the Court will be paid by Discover on top of (i.e., in addition to) the Settlement Payments to Settlement Class Members, within 14 days after entry of the Judgment.  Settlement §§ 3.6.1, 3.6.3.  Settlement Class Counsel will file their fee application, which will provide the supporting basis for their request, at least 70 days in advance of the Objection Deadline, and it will be available on the Settlement Website after it is filed.  Settlement Class Members will thus have the opportunity to comment on or object under Fed. R. Civ. P. 23(h) prior to the Final Approval Hearing.

**G.**     **There Are No Additional Agreements to Disclose (Rule 23(e)(2)(C)(iv)).**

Finally, Plaintiffs must identify any agreements "made in connection with the proposal." Fed. R. Civ. P. 23(e)(3); *see* Fed. R. Civ. P. 23(e)(2)(C)(iv).  This provision is aimed at "related undertakings that, although seemingly separate, may have influenced the terms of the settlement by trading away possible advantages for the class in return for advantages for others."  Fed. R. Civ. P. 23(e)(2), 2003 adv. comm. note.  There are no such agreements to disclose.

### III. The Proposed Notice Program Will Provide the Best Notice Practicable and Should Be Approved.

Before a proposed class settlement may be finally approved, the Court "must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1)(B). Where certification of a Rule 23(b)(3) settlement class is sought, the notice must also comply with Rule 23(c)(2)(B), which requires:

> the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice may be by one or more of the following: United States mail, electronic means, or other appropriate means. The notice must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 176 (1974).

The proposed Notice Program here (Azari Decl., Ex. 2) was designed in consultation with the proposed Settlement Administrator and meets all applicable standards.[17] As summarized *supra* at Section V.D, it includes initial direct notice by mail/email to all identified Settlement Class Members and to potential Settlement Class Members; additional direct notice to entities and addresses identified through the notice and claims process; two rounds of reminder email notices in advance of the Settlement Claim Deadline; an extensive internet, radio, and print media notice campaign; and the establishment of a case-specific Settlement Website and Toll-Free Number.

Moreover, the proposed forms of notice (Notice Program, Attachments 1a-2f) inform Settlement Class Members, in clear and concise terms, about the nature of this case, the

---

[17] *See generally* Azari Decl.

Settlement, what they need to do to get payments, and their other rights, including all of the information required by Rule 23(c)(2)(B). The proposed class notices are "easy to read" and "easily understandable by the layperson," and "[t]o the extent a Settlement Class Member has a question after reading the Class Notice, he or she is directed to call a toll-free number" or to visit the website "where the Class Member can obtain answers to commonly asked questions." *Mangone v. First USA Bank*, 206 F.R.D. 222, 233 (S.D. Ill. 2001). The direct notices will also include unique IDs and PIN numbers to facilitate online claim submission and tracking. *See* Settlement § 5.4. The Court should approve the proposed Notice Program.

## IV.     The Court Should Certify the Settlement Class for Settlement Purposes.

The Court should certify the Settlement Class for settlement purposes because the standards of Rule 23(a) and Rule 23(b)(3) are satisfied.

### A.     The Requirements of Rule 23(a) are Satisfied.

*Numerosity* (**Rule 23(a)(1)**). The numerosity requirement is satisfied if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P 23(a)(1); *Anderson v. Weinert Enterprises, Inc.*, 986 F.3d 773, 777 (7th Cir. 2021). Here, while the precise number of Settlement Class Members is not known, the scope of the known universe, alone, is very large. Based on Discover's records there are more than 11 million MIDs with identified Misclassified Card Transactions, and millions of businesses associated with those affected MIDs. Joinder of that many persons or entities would be impracticable.

*Commonality* (**Rule 23(a)(2)**). The commonality requirement is satisfied if there is at least one question of law or fact that is common to the class and capable of generating "common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis in original); *accord Scott v. Dart*, 99 F.4th 1076, 1088 (7th Cir. 2024). Here, there are multiple such common questions, including whether Discover

-30-

misclassified the accounts and transactions at issue as "Commercial," whether Discover's internal account classification system created a legal obligation to the Settlement Class, and whether Discover was unjustly enriched. Commonality is therefore satisfied.

*Typicality* (**Rule 23(a)(3)**). The typicality requirement is satisfied where "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3); *McFields v. Dart*, 982 F.3d 511, 517 (7th Cir. 2020). Where a defendant engages "in a standardized course of conduct vis-a-vis the class members, and plaintiffs' alleged injury arises out of that conduct," typicality is "generally met." *Abdallah v. FedEx Corp. Servs., Inc.*, No. 16-CV-3967, 2021 WL 979143, at *7 (N.D. Ill. Mar. 16, 2021) (quoting *Physicians Healthsource, Inc. v. A-S Medication Sols., LLC*, 318 F.R.D. 712, 723 (N.D. Ill. 2016)). Here, the Settlement Class Representatives' claims are based on the same alleged systemic misclassification, and arise under the same theories, as those of the Settlement Class.

*Adequacy* (**Rule 23(a)(4)**). The adequacy requirement looks to whether the representative parties are able to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To establish adequacy, plaintiffs must show that: "(1) their claims are not antagonistic to or in conflict with those of the proposed class; (2) they have sufficient interest in the outcome of the case; and (3) experienced, competent counsel represents them." *Smith v. City of Chicago*, 340 F.R.D. 262, 290 (N.D. Ill. 2021) (quoting *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 256 F.R.D. 586, 599 (N.D. Ill. 2009)). Here, the Settlement Class Representatives' interests are aligned with, and are not antagonistic to, the rest of the Settlement Class. All Settlement Class Members share an interest in Discover being held to account for the alleged misclassifications. Moreover, the Settlement Class Representatives are committed to this case and to representing the interests of the Settlement Class, as demonstrated by the fact that they

-31-

have remained engaged in the litigation and months-long negotiations process that led to the proposed Settlement. Joint Decl. ¶ 35. Moreover, the Settlement Class Representatives have retained counsel who are highly qualified and experienced in class action and complex litigation—i.e., proposed Settlement Class Counsel—to prosecute this case. Joint Decl. ¶¶ 24-34.

### B. The Requirements of Rule 23(b)(3) are Satisfied.

In addition to the requirements of Rule 23(a), at least one of the prongs of Rule 23(b) must be satisfied. Here, Plaintiffs seek certification of the Settlement Class, for settlement purposes, under Rule 23(b)(3), which requires that "questions of law or fact common to the class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"The predominance inquiry 'asks whether the common, aggregation enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citation omitted)). At its core, "[p]redominance is a question of efficiency." *Butler v. Sears, Roebuck & Co.*, 702 F.3d 359, 362 (7th Cir. 2012). Common questions predominate here. The Settlement Class Members' claims all arise from the same common course of conduct, and the predominant questions here include whether Discover misclassified the accounts and transactions in question under its own common classification criteria, whether Discover's internal account classification system created a legal obligation to the Settlement Class, and whether Discover was unjustly enriched. Moreover, under the proposed Settlement, there will not need to be a class trial, meaning there are no potential concerns about any individual issues, if any, creating trial inefficiencies. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) ("Confronted

-32-

with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there will be no trial.").

Rule 23(b)(3)'s superiority inquiry calls for a comparative analysis of whether a class action is "superior to other available methods for fair and efficient adjudication of the controversy." *Id*. at 615. In considering "superiority," courts analyze: (i) class members' interest in individually controlling separate actions; (ii) the extent and nature of existing litigation by class members concerning the same claims; (iii) the desirability of concentrating the litigation in a particular forum; and (iv) any likely difficulties of managing a class action. Here, class treatment is superior to other methods for the resolution of this litigation. Plaintiffs are unaware of any individual actions against Discover regarding the issues raised in this case. *See Carnegie v. Household Int'l., Inc.,* 376 F.3d 656, 661 (7th Cir. 2004) ("The realistic alternative to a class action is not 17 million individual suits, but zero individual suits . . . ."). In all events, persons/entities within the Settlement Class remain free to exclude themselves if they wish to do so. Moreover, it would be far more efficient for the Court and the parties to have a single resolution (as with the proposed Settlement here), rather than multiple separate cases (or, Discover would argue, individual arbitrations) about the same issue. *See Prokhorov v. IIK Transp., Inc.*, No. 20 CV 6807, 2023 WL 2711599, at *10 (N.D. Ill. Mar. 30, 2023) ("Even if their claims are large enough to be worth pursuing individually, the commonality of the claims is a reason to find a class action superior."). A class action is therefore the superior method of adjudicating the Settlement Class's claims.

## V.        The Court Should Schedule the Final Approval Hearing and Related Dates.

The next steps in the settlement approval process are to notify Settlement Class Members of the proposed Settlement, allow Settlement Class Members an opportunity to exclude

-33-

3085562.2

themselves or file objections, and hold a Final Approval Hearing.  Towards those ends, the

parties propose the following schedule:

| Event | Timing/Deadline |
|---|---|
| Settlement Class Notice Program begins | Ninety (90) days after entry of Preliminary Approval Order ("PAO") |
| Motion for Attorneys' Fees and Expenses | Two hundred (200) days after entry of PAO |
| Motion for Final Approval Order | Two hundred (200) days after entry of PAO |
| Objection Deadline | Two hundred seventy (270) days after entry of PAO |
| Opt-Out Deadline | Two hundred seventy (270) days after entry of PAO |
| Settlement Claim Deadline | Three hundred sixty five (365) days after entry of PAO |
| Final Approval Hearing | Three hundred and seventy two (372) days after entry of PAO (or as soon thereafter as is convenient for the Court) |

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court do the following:

(a)  Grant preliminary approval of the proposed Settlement;

(b)  Certify, for settlement purposes, the Settlement Class as defined in the Settlement, pursuant to Fed. R. Civ. P. 23(a) and (b)(3);

(c)  Appoint Plaintiffs CAPP, Inc., Young Peoples Day Camps Inc., Prayus Group LLC, Lemmo's Pizzeria, LLC, and Lennys Casita, LLC as Settlement Class Representatives representing the Settlement Class;

(d)  Appoint Roger N. Heller of Lieff Cabraser Heimann & Bernstein LLP, Catherine Pratsinakis of Dilworth Paxson LLP, and Taras Kick of The Kick Law Firm, APC as Settlement Class Counsel;

(e)  Approve the Parties' proposed Notice Program, including the proposed forms of notice, and direct that notice be disseminated pursuant to such Notice Program;

(f)  Appoint Epiq Class Action & Claims Solutions, Inc. ("Epiq") as Settlement Administrator, and direct Epiq to carry out the duties and responsibilities of the Settlement Administrator specified in the Settlement;

(h)  Set deadlines for Settlement Class Members to request exclusion from the Settlement Class and to object to the Settlement;

-34-

(i)     Stay all non-Settlement related proceedings in these cases pending final approval of the Settlement; and

(j)     Set a Final Approval Hearing and certain other dates in connection with the final approval of the Settlement, as set forth herein.


Dated: August 27, 2024                    Respectfully submitted,

                                    By:   */s/ Roger Heller*

                                          Roger N. Heller (*pro hac vice*)
                                          Michael K. Sheen (*pro hac vice*)
                                          LIEFF CABRASER HEIMANN &
                                          BERNSTEIN LLP
                                          275 Battery Street, 29th Floor
                                          San Francisco, California 94111
                                          Tel: (415) 956-1000
                                          Fax: (415) 956-1008
                                          rheller@lchb.com
                                          msheen@lchb.com

                                          Margaret M. Becko (*pro hac vice*)
                                          LIEFF CABRASER HEIMANN &
                                          BERNSTEIN LLP
                                          250 Hudson Street, 8th Floor
                                          New York, NY 10013-1413
                                          Tel.: (212) 355-9500
                                          Fax: (212) 355-9592
                                          mbecko@lchb.com

                                    By:   */s/ Taras Kick*

                                          Taras Kick (*pro hac vice* admitted)
                                          Tyler Dosaj (*pro hac vice* admitted)
                                          THE KICK LAW FIRM, APC
                                          815 Moraga Drive
                                          Los Angeles, California 90049
                                          Tel: (310) 395-2988
                                          Fax: (310) 395-2088
                                          Taras@kicklawfirm.com
                                          Tyler@kicklawfirm.com

-35-

By:  */s/ Catherine Pratsinakis*

Catherine Pratsinakis
Nina C. Spizer
DILWORTH PAXSON LLP
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
Telephone:  (215) 575-7000
Facsimile:  (215) 575-7200
cpratsinakis@dilworthlaw.com
nspizer@dilworthlaw.com

*Proposed Settlement Class Counsel*

## <u>CERTIFICATION PURSUANT TO GENERAL ORDER 16-0020</u>

I hereby certify that the content of the document is acceptable to all persons required to sign the document, and all such persons have consented to inclusion of their electronic signatures on the document.

Dated: August 27, 2024                                    _/s/ Roger N. Heller_____

3085562.2